59 CCPA

**GLENWOOD LABORATORIES, INC.,**
**Appellant,**

v.

**AMERICAN HOME PRODUCTS CORP.,**
**Appellee.**

**Patent Appeal No. 8612.**

United States Court of Customs
and Patent Appeals.
March 9, 1972.

Rehearing Denied April 20, 1972.

Rao, J., filed a concurring opinion; Rich and Baldwin, JJ., filed dissenting opinions.

Eugene C. Knoblock, South Bend, Ind., attorney of record, for appellant.

Mortimer Altin, Julius A. Bell, New York City, attorneys of record, for appellee.

Before RICH, ALMOND, BALDWIN, and LANE, Judges, and RAO, Judge, United States Customs Court, sitting by designation.

LANE, Judge.

This is an appeal from the decision of the Trademark Trial and Appeal Board, 161 USPQ 826 (1969) (report of result only), sustaining an opposition to the registration of MYOCHOLINE [1] for

1. Application Serial No. 210,558, filed January 25, 1965.

a medicinal preparation for treatment of dysphagia, abdominal distention, gastric retention, and urinary retention, filed by appellee, the owner of the prior registration of MYSOLINE [2] for an anti-convulsant drug, on the ground that MYOCHOLINE so resembles MYSOLINE "as to be likely, when applied to the goods of the applicant, to cause confusion, or to cause mistake, or to deceive." Lanham Act, § 2(d), 15 U.S.C. § 1052(d). We affirm.

Appellant's MYOCHOLINE is a pharmaceutical dispensed on prescription in tablet form through the normal drug channels. It was marketed in 1964 and advertised in medical journals, at professional conventions and by direct mail. Opposer's MYSOLINE is also dispensed only on a prescription basis and may be procured in tablet form as well as in liquid suspension. Sales of MYSOLINE during the period 1957 through 1966 were found by the board to exceed $17,000,000, and advertising expenditures during the same time period surpassed $1,000,000. Opposer's drug is a suppressant of convulsions and is indicated for treatment of epilepsy, petit and grand mal, and other psychomotor defects. Appellant's drug is contraindicated for use by those afflicted with the disorders for which MYSOLINE is prescribed.

Appellant asserts that there is no likelihood of confusion, that the marks are dissimilar in structure, and that when broken down into its constituent parts, each mark can be seen to be suggestive of the nature of the product it identifies. MYSOLINE is a three-syllable word whereas MYOCHOLINE is composed of four syllables. The marks are different in the middle syllables—"O–CHOL" as contrasted with "SOL". These differences are asserted to be significant as well as audibly and visually distinguishing. Appellant states that "CHOL" connotes the product as a choline derivative thereby indicating the chemical origin of the drug. On the other hand, "SOL" must, it is urged, suggest "solace"—the relaxing quality of opposer's anticonvulsant. According to appellant, "MY" and "MYO" mean muscle, while "INE" means "characterized by," and a number of third-party registrations of marks applied to drugs which utilize these word segments were introduced to show the etymology of the two marks here in issue. It would follow, according to appellant, that MYOCHOLINE suggests a medicine for treatment of a muscle disorder characterized by derivation from a choline compound whereas MYSOLINE would indicate a drug characterized by affording solace and relaxation to an affected muscle. It appears to us that appellant's analysis of opposer's mark yields a definition which would be equally applicable to the drug identified by MYOCHOLINE.

We regard appellant's approach as too myopic. It is the *entirety* of each mark as applied to the respective drug which must be considered. Although appellant does contend that the segment of the public which would have the responsibility of distinguishing between the drugs identified by these marks, i. e., physicians and pharmacists, is a discriminating class; nevertheless, we must still look to the whole of the marks, and we are satisfied that even within this class of persons there is a likelihood of confusion. We agree with the reasoning of the board expressed in its unpublished opinion in relevant portion as follows:

> The question of likelihood of confusion in this case depends upon a consideration of the marks reviewed in their entireties. The existence of third party registrations of similar marks or the listing of such marks in a directory has very little weight on this question. * * * [citation omitted]. Applicant's own witness, an independent pharmacist, stated that neither the prefix "my" or "myo" nor the suffix "ine" has any meaning to a pharmacist.
>
> *     *     *     *     *     *

---

2. Reg.No. 569,143, registered January 13, 1953.

In considering the marks "MYO-CHOLINE" and "MYSOLINE", we find substantial similarities therebetween. These similarities are apparent in appearance and especially in sound. And in our opinion these similarities are such as to be likely to cause confusion or mistake.

Applicant emphasizes the opinion of its witness that it is highly impossible there would ever be any confusion arising from the dispensing of the products of the parties. Much of this opinion is based on matters other than the mark and that pharmacists never make mistakes. Notwithstanding, this witness indicated that "HYCMOINE" and "HYCODAN" were examples "where there might be a possibility for confusion." The testimony of this witness is wholly unpersuasive that there would be no likelihood of confusion resulting from the contemporaneous use of "MYOCHOLINE" and "MYSO-LINE".

The fact that confusion as to prescription drugs could produce harm in contrast to confusion with respect to non-medicinal products was an additional consideration of the board as is evident from that portion of the opinion in which the board stated:

> The products of the parties are medicinals and applicant's product is contraindicated for the disease for which opposer's product is indicated. It is apparent that confusion or mistake in filling a prescription for either product could produce harmful effects. Under such circumstances, it is necessary, for obvious reasons, to avoid confusion or mistake in the dispensing of the pharmaceuticals. * * * [citations omitted].

The board's view that a higher standard be applied to medicinal products finds support in previous decisions of this court, Clifton v. Plough, 341 F.2d 934, 936, 52 CCPA 1045, 1047 (1965) ("[I]t is necessary, for obvious reasons, to avoid confusion in the dispensing of pharmaceuticals."); Campbell Products, Inc. v. John Wyeth & Bro., Inc., 143 F.2d 977, 979, 31 CCPA 1217, 1220 (1944) ("[I]t seems to us that where ethical goods are sold and careless use is dangerous, greater care should be taken in the use and registration of trade-marks to assure that no harmful confusion results."). As Judge Rich points out in dissent, this is a doctrine which has been adopted by other federal courts in which injunction against the use of a mark has been sought on the ground of likelihood of confusion. Judge Rich, however, would distinguish between actions brought to enjoin *use* and inter partes contests arising in the Patent Office (as well, presumably, as ex parte actions arising in the Patent Office) wherein it is *registration* which is sought to be prevented. Because use or nonuse is independent of registration, and since a judgment of this court can only affect registration, Judge Rich concludes that any special harm which might result from confusion of goods in use stemming from similarity in the identifying marks is a consideration irrelevant to any trademark proceeding before us. We cannot agree with this view. Instead, we reaffirm our position as accurately presented by the board in this case.

Judge Rich's theory respecting the distinction between registration and use is at first blush tempting even without the support of prior decisions of this court. It fails, however, when the role of the Patent Office in the statutory registration of trademarks is fully appreciated. By its nature, likelihood of confusion relates to use. Confusion is determined in part by a comparison of marks, but the ultimate question is whether in use there would be a likelihood of confusion as a result of trademark similarity. Congress has seen fit to prohibit registration for this reason, and that legislative action compels the conclusion that some impediment to use was hoped for by denying registration. Section 32(1) (a) of the Lanham Act, 15 U.S.C. § 1114(1) (a), imposes civil liability for the "use in commerce [of] any reproduction, * * copy, or colorable imitation of a registered mark in connection with the sale,

offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive * * *." In other words, the initial agency determination of likelihood of confusion is similar to that required to establish infringement. Under such circumstances, the Patent Office conclusion of likelihood of confusion operates as a potent impediment to use—the result intended by Congress. The converse is equally true. A Patent Office finding of no likelihood of confusion is an incentive to use. Indeed, registration on the principal register is prima facie evidence of registrant's right to use the mark in commerce. Lanham Act, § 7(b), 15 U.S.C. § 1057(b).

■■ In effect, we are saying that the Patent Office functions as a guardian of the public interest in interposing an obstacle to the use of marks which when applied to goods to be consumed by the public would be likely to confuse. This was the thesis advanced by Professor Derenberg, The Patent Office As Guardian of the Public Interest in Trade-Mark Registration Proceedings, 14 Law and Contemporary Problems 288 (1949), and he found a specific legislative intent to confer that responsibility in the § 2 (d) prohibition against registration of marks which are likely to cause confusion, mistake, or to deceive. Once the transition is made from pure registration considerations to a consideration of the marks in use, it follows immediately that the nature of the goods becomes a relevant factor. The goods here involved being drugs, confusion as to which could unquestionably give rise to serious consequences, we thing due consideration ought properly be given that fact in the determination of likelihood of confusion.

With regard to Judge Rich's ultimate conclusion that no public interest would be served by denying registration in this case, we have little doubt that our contrary conclusion is colored by our differing views as to the actual likelihood of confusion stemming from contemporaneous use of the marks involved.

The decision of the Trademark Trial and Appeal Board sustaining the opposition and refusing the registration of MYOCHOLINE is affirmed.

Affirmed.

RAO, Judge (concurring).

I agree with Judge Lane that the decision of the Trademark Trial and Appeal Board sustaining the opposition and refusing the registration of MYOCHOLINE should be affirmed.

This case turns on the issue of whether registration of appellant's trademark MYOCHOLINE was properly refused on the ground that it so resembled appellee's trademark MYSOLINE, previously registered, "as to be likely, when applied to the goods of the applicant, to cause confusion, or to cause mistake, or to deceive." Section 2(d), Trademark Act of 1946 (15 U.S.C. § 1052(d)).

Two judges of this court have found a reasonable likelihood of confusion, mistake, or deception and two have not. In my opinion, that fact in itself is sufficient to create doubt on the issue whether confusion is not only possible, but likely. The record also reveals conflicting opinions of the expert witnesses as to whether MYOCHOLINE could be mistakenly dispensed by pharmacists for MYSOLINE or vice versa. It is well settled that where there is doubt as to whether confusion or mistake is likely, the doubt is to be resolved against the newcomer, in this case MYOCHOLINE. Whitehall Pharmacal Co. v. Denney, 255 F.2d 693, 45 CCPA 962 (1958); American Throwing Co., Inc. v. Famous Bathrobe Co., Inc., 250 F.2d 377, 45 CCPA 737 (1957); Kemin Industries, Inc. v. Flavor Corp. of America, 440 F.2d 1375, 58 CCPA 1180 (1971); Geigy Chemical Corp. v. Atlas Chemical Industries, Inc., 438 F.2d 1005, 58 CCPA 972 (1971).

Furthermore, in view of the fact that MYOCHOLINE is contraindicated for use by and would cause harm to patients for whom MYSOLINE is prescribed, any doubt should be resolved in favor of the exercise of greater care for the protection of the public.

This was the view expressed by this court in Campbell Products, Inc. v. John Wyeth & Bro., Inc., 143 F.2d 977, 979, 31 CCPA 1217, 1220 (1944) and adhered to in Clifton v. Plough, Inc., 341 F.2d 934, 936, 52 CCPA 1045, 1047 (1965): "Moreover, it seems to us that where ethical goods are sold and careless use is dangerous, greater care should be taken in the use and registration of trademarks to assure that no harmful confusion results."

The *Campbell* case was cited in Morgenstern Chemical Co., Inc. v. G. D. Searle & Co., 253 F.2d 390 (3rd Cir. 1958), where the court elaborated upon the reasons for the "greater care doctrine", stating (pp. 393–394):

> The defendant concedes that physicians and pharmacists are not infallible but urges that the members of these professions are carefully trained to detect differences in the characteristics of pharmaceutical products. While this is doubtless true it does not open the door to the adoption by manufacturers of medicine of trade-marks or names which would be confusingly similar to anyone not exercising such great care. For physicians and pharmacists are human and in common with the rest of mankind are subject to human frailties. In the field of medicinal remedies the courts may not speculate as to whether there is a possibility of confusion between similar names. If there is any possibility of such confusion in the case of medicine public policy requires that the use of the confusingly similar name be enjoined.

Although the *Morgenstern* case was a suit for an injunction rather than for a trademark registration, the public policy in the two situations remains the same. While denial of registration may not prevent use of the confusing trademark, it is bound to have some inhibiting effect. If the use continues and an infringement suit should be brought, the denial of registration, while not conclusive, would be entitled to great weight. W. E. Bassett Co. v. Revlon, Inc., 435 F.2d 656 (2nd Cir. 1970); Syntex Laboratories, Inc. v. Norwich Pharmacal Co., 437 F.2d 566 (2nd Cir. 1971). This in itself is a deterrent. In view of the possibility of harm from a mistake, even though the greatest care is ordinarily used by pharmacists, and even though denial of registration may not be a complete deterrent to use of the appellant's trademark, I am of the opinion that the board's decision refusing to register MYOCHOLINE was proper.

RICH, Judge (dissenting).

Considering the whole record in this case, I do not see a reasonable likelihood of confusion, mistake, or deception under § 2(d). The goods here are not over-the-counter items or in the category of "impulse" merchandise sold in supermarkets. Of course MYSOLINE and MYOCHOLINE flow through the same channels of trade but only through drug wholesalers, pharmacists, doctors, and medical personnel who are very knowledgeable about drugs, drug names, and uses and more than usually careful in identifying them. It is not a case of different brands of the *same* merchandise.

One of appellee's main arguments is the "serious consequences" which might flow from MYOCHOLINE being "mistakenly taken" by an epileptic who is being treated with MYSOLINE, the background facts being that MYSOLINE is an anti-convulsant and MYOCHOLINE is specifically contraindicated in patients with epilepsy. I think appellee's argument is self-defeating because the very fact of the contraindication makes it highly improbable that an epileptic himself would have access to both of these prescription drugs for self-administration, and I cannot imagine trained medical personnel of any kind substituting one for the other, especially when it is the fact that U. S. Food and Drug Administration regulations require prominent marking of the drugs with their generic names.

The other main theme in appellee's argument, accepted by the board and the

majority, is the so-called "greater care doctrine" applicable to pharmaceuticals for human use. I consider this doctrine fallacious in proceedings in the Patent Office for the registration of marks—which this proceeding is. Its application here involves consideration of irrelevancies. The majority approvingly adopted the board's reiteration of this doctrine in the quoted portion of its opinion where it was said:

The products of the parties are medicinals * * *. Under such circumstances, it is necessary, for obvious reasons, to avoid confusion or mistake in the dispensing of the pharmaceuticals. [Citing two decisions of this court.]

I ask the majority and I ask the board how they think their decisions are going to "avoid confusion or mistake in the dispensing of pharmaceuticals." We are here involved in adjudicating a right to register a trademark in the Patent Office and do not have the slightest concern with dispensing pharmaceuticals or anything connected therewith, such as labeling, advertising, or the like.

What is this "greater care doctrine," where did it come from, and what does it mean? More particularly, what does it have to do with the right to register in the Patent Office? In this court it has cropped up infrequently and, it seems to me, largely as a result of non-thinking. Appellee is here attempting to slip it over once more—no doubt in good faith. The case principally relied on in its brief is a Third Circuit Court of Appeals opinion in a suit for unfair competition and for an *injunction* against the use of a mark in which an injunction was granted and an accounting denied, Morgenstern Chemical Co., Inc. v. G. D. Searle & Co., 253 F.2d 390 (1958). It also relies on a recent Second Circuit Court of Appeals opinion in a suit for trademark infringement affirming the grant of a *preliminary injunction*, Syntex Laboratories, Inc. v. Norwich Pharmacal Co., 437 F.2d 566 (1971). These suits were, of course, for the purpose of stopping the defendants from *using*

trademarks and had nothing directly to do with right to register. On the contrary, this appeal is concerned only with right to *register* and has nothing to do—directly, at least—with right to use.

In the *Morgenstern* case the court said, properly (emphasis mine):

In the field of medical products, it is particularly important that great care be taken to prevent any possibility of confusion in the *use* of trademarks. [Citing in a footnote three old cases in this court, only one of which supports the statement, and one in a District Court in Missouri in an injunction suit.] * * *.

* * * * * *

* * * In the field of medicinal remedies the courts may not speculate as to whether there is a probability of confusion between similar names. If there is any possibility of such confusion in the case of medicines public policy requires that *the use* of the confusingly similar name *be enjoined.* [Citing in a footnote a 1915 D.C. N.Y. case.]

That is, of course, sound law in injunction suits where the use of a mark *can* be stopped and confusion *avoided* in the future. To talk of avoiding confusion in this court by denying registration is nonsense because denying registration has little if any effect on use. The same is true of decisions in the Patent Office. I therefore cannot agree with the reasoning of the board, approved by the majority, wherein it supported its decision sustaining the opposition by saying, "it is necessary, for obvious reasons, to *avoid confusion or mistake* in the dispensing of the pharmaceuticals." (My emphasis.) Though it cited two of our opinions in support, the board was erroneously importing into a registration proceeding considerations relevant only to an injunction suit. It has no power to "avoid confusion or mistake." Denial of a registration does not have that effect. Nothing short of an injunction does.

The cases cited by the board were Merritt Corp. v. Sterling Drug, Inc., 277

F.2d 956, 47 CCPA 937 (1960), and Clifton v. Plough, Inc., 341 F.2d 934, 52 CCPA 1045 (1965). In the *Merritt* case (SUPRARENIN v. SUPERIN), while the board, in portions of its opinion quoted by us, said "greater care should be taken in the use and registration of trademarks [for ethical drugs] to assure that no harmful confusion results," we did not approve that notion or say anything resembling it. In the *Clifton* case (NUJOL v. NUMOL), after noting that confusing the products could produce harmful effects, we unhappily said, "As stated by the board, it is necessary, for obvious reasons, to *avoid* confusion in the dispensing of pharmaceuticals." (My emphasis.) Since I joined in that opinion, I now wish to make clear, as I hope I have above, that I do not think our rulings in cases of this kind have any significant influence on the avoiding of confusion. All we do here is perform our judicial function with respect to the administration of a statute pertaining to registration of marks in the Patent Office, marks which of necessity have already been in use for many years before we render our decisions. In this case MYOCHOLINE has been in use since July 9, 1964, and its use apparently has had the approval of the Food and Drug Administration. Opposer-appellee objected to the use in May of 1965, and in November 1967 appellant's president testified that his company had nevertheless continued to promote, sell, and advertise the product under that mark. I assume it has continued since. I do not expect the majority's decision to stop it. The record does not show that appellee has taken any steps to do so.

Appellee appears to have enjoyed some six and a half years of uninterrupted use of the trademark MYOCHOLINE. The record fails to show any instance of actual confusion, and I think it is reasonable to infer that there has been none, else appellee would have made much of it. The marks differ substantially in appearance, spelling, sound,* and suggestiveness (if any). Therefore § 2(d) does not compel refusal to register. Under the circumstances I think it is preferable that the Principal Register should reflect the realities of the situation and record appellant's ownership of MYOCHOLINE. The rights appellant would thereby acquire would aid it in inhibiting the adoption by others of marks similar to MYOCHOLINE the use of which might really cause confusion, mistake, or deception. I can see no public interest to be served by sustaining this opposition. I would reverse.

The foregoing remarks have caused the majority to add to its initial opinion an attempted refutation, the gist of which is that refusal to register MYOCHOLINE really will have a substantial deterrent effect on its use and will therefore "avoid" confusion or mistake, in both the marketplace and the sick room, which would otherwise be likely to take place. I am not persuaded of two things: (1) that confusion or mistake is reasonably likely and, assuming I am wrong in that, (2) that mere refusal to register will *avoid* confusion or mistake. In saying this I am talking about the *products*, not their source, because the arguments here have not taken the usual course of confusion as to the source of the goods.

I cannot help wondering what the Patent Office would have done, ex parte, by way of avoiding public confusion or mistake, if the application to register MYOCHOLINE had been filed by appellee, the owner of MYSOLINE.

---

* Opposer's mark would have to be pronounced MICE–OH–LEAN and appellant's mark MY–O–COAL–EEN, three syllables and four, respectively. I think we must assume that those who prescribe and dispense these drugs would necessarily acquire a familiarity with these marks tending to assure against confusion. The general public, due to familiarity, does not, for example, confuse aspirin and "Anacin" though, over all, they are more alike than the marks here involved.

BALDWIN, Judge (dissenting).

I agree with Judge RICH that there is no reasonable likelihood of confusion in this case. I am unwilling to assume that physicians and pharmacists do not compensate for the serious consequences errors on their part might have by maintaining a high degree of caution, both for the sake of their patients and for the sake of their liability. See the dissenting opinion in Geigy Chemical Corp. v. Atlas Chemical Industries, Inc., 438 F.2d 1005, 1008, 58 CCPA 972 (1971).