**STERLING DRUG INC., Appellant,**

v.

**SEBRING, Appellee.**

**Patent Appeal No. 74–624.**

United States Court of Customs and Patent Appeals.

May 8, 1975.

---

Rogers, Hoge & Hills, New York City, attorneys of record, for appellant; Marie V. Driscoll, New York City, of counsel.

William H. Pavitt, Jr., Bernard Kriegel, Los Angeles, Cal., attorneys of record, for appellee.

Before MARKEY, Chief Judge, RICH, LANE and MILLER, Judges, and ALMOND, Senior Judge.

RICH, Judge.

This appeal is from the majority decision, one member dissenting, of the Trademark Trial and Appeal Board, 183 USPQ 117 (1974), dismissing appellant's opposition to the registration of a design

mark in the form of an ankh or ansate cross [1] as follows:

Appellee's application, serial No. 377,976, filed Dec. 17, 1970, claims first use in April 1966 [2] with first use in interstate commerce in January 1967 and describes the goods as hair conditioner and hair shampoo. The evidence shows the conditioner to be an aerosol spray for holding the hair in place.

Appellant-opposer pleaded four registrations of the ankh mark owned by it and an institutional use, said use and one of the registrations having dates prior to appellee's earliest asserted date. Priority of use is clearly in appellant, as the board found, and is not contested by appellee.

The controlling statute is section 2(d) of the Trademark Act of 1946 (15 U.S.C. § 1052(d)) which, in pertinent part, reads:

> No trade-mark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it—
>
> \* \* \* \* \* \*
>
> (d) consists of or comprises a mark which so resembles a mark *regis-*

*tered* in the Patent Office or a mark or trade name previously *used* in the United States by another and not abandoned, as to be likely, when applied to the goods of the applicant, to cause confusion, or to cause mistake, or to deceive \* \* \*. [Emphasis ours.]

Appellant's earliest registration is No. 434,468, issued November 18, 1947, to Aschenbach & Miller, Inc., acquired by assignment which was recorded in the Patent Office on April 29, 1966. Appellee raises no question about appellant's ownership. The registration was renewed in 1967. The goods named in the registration are "a remedy for rheumatism, sciatica, lumbago, neuralgia, toothache, backache and like ailments, and veterinary medicines." The mark registered is as follows:

The other registrations are No. 819,786, Dec. 6, 1966, issued to Sterling Drug Inc. as assignee of Aschenbach & Miller, for the same mark, the goods named being "glycerine for use in cough medicines and a liniment to be used externally for muscular soreness due to exertion, exposure or fatigue, mild neuralgia, mild headache and sprains"; No. 839,048,

---

1. The parties call it an "ansated" cross but all of the dictionaries we have consulted indicate that "ansate" is the proper form. This adjective is defined in *The Random House Dictionary of the English Language* (1967) as meaning "having a handle or handle-like part." "Ansa" is defined as an archaeological term meaning "a looped handle, esp. of a vase." "Ansate cross" is defined as "ankh" and the latter word is defined to mean *"Egyptian Art.* a tau cross with a loop at the top, used as a symbol of generation or enduring life." Various dictionaries illustrate ankhs in various forms.

2. When appellee's counsel prepared to take testimony he discovered records showing that Sebring actually started using the ankh in 1963, and the evidence appears to show that.

Nov. 21, 1967, for "analgesic preparation for human use"; and No. 932,812, Apr. 25, 1972, for "pharmaceutical preparations for human and veterinary use." The ankh illustrated in the last two registrations is as follows:

The genesis of appellant's use of the ankh was in connection with a division of the corporation known as the Sterling-Winthrop Research Institute. The director and assistant director of that institute encountered the ankh on a trip to Egypt in 1945 and later decided to use it as a symbol of the Institute. A new building built for it about 1950 incorporated the symbol in the terrazzo flooring of the main entrance and on various glass doors. It was applied to the Institute's stationery, employees' business cards, reprints of scientific articles distributed to the academic community and pharmaceutical industry, and on various souvenirs given to those attending seminars given at the Institute. The work of the Institute has been primarily research for Sterling Drug and the development of new products for its divisions and subsidiaries, it has worked for the United States Government, conducted seminars, collaborated with consultants and consulting laboratories, and has made its building available to many professional groups in the medical, dental, chemical, and pharmaceutical fields for meetings. The research director estimated that about 10,000 souvenirs bearing the ankh symbol had been given away, some of which, such as ash trays, had ended up in the waiting rooms of doctors and dentists. Among products developed by the Institute there have been a surgical scrub sold by Winthrop Laboratories, under the name "pHisoDerm," and a shampoo known as "pHisoDan" also developed for Winthrop Laboratories, a division of appellant. It is not contended that the ankh was used on either of those products. The evidence was intended to show that shampoo is not foreign to Sterling's business.

Apart from the use by the Institute, appellant's use of the ankh as a trademark on products is summarized in its brief as follows (references to the record only omitted):

In or about January, 1964, Sterling decided to extend the use of its valuable ansated cross symbol and use it as a trademark on products distributed by it. It stamped the symbol directly on analgesic pills and made trademark use on that product by shipping it on January 14, 1964. This use was extended to cold tablets in February of that year. Both the analgesic product and the cold tablet were distributed for investigational new drug use. As of 1966 the symbol was still being used on the analgesic * * *.

Then, in October, 1967, use of the mark was extended to a veterinary product and to three prescription products including anti-malarial preparations and a muscle relaxant * * *. These products are distributed through pharmacies, discount chains, supermarkets, and to small hospitals and surgical supply accounts * * *. Since 1967, appellant has sold $12 million of these products * * *.

Appellee does not contest these statements.

## OPINION

On the facts as above set forth, we believe the board erred in dismissing the opposition and we reverse.

On the face of the board's opinion we feel that it erred in three particulars. It held that the evidence as to the use of the ankh by the Sterling-Winthrop Research Institute "is clearly irrel-

evant and immaterial." We disagree. The Institute's use was the beginning of the use by appellant. Section 2(d) is not limited to use as a trademark or service mark; it refers broadly to "a mark or trade name previously used in the United States by another." If a mark such as the ankh has come to symbolize the business of an opposer, to be its identifying mark, its use by another may well lead the public to believe there is some connection, and confusion as to the origin or sponsorship of a product may well result. The evidence of the Institute's use is both relevant and material to the issue here.

 The board said that evidence that opposer and certain other pharmaceutical houses distribute both ethical drug products and grooming aids such as shampoo is "of no particular consequence here if for no other reason than that it has not been made to appear that the said products are sold under the same mark." Again we disagree. While evidence of the sale of ethical drugs[3] and grooming aids under the *same* mark would indeed make a *stronger* case, in the absence of any showing that pharmaceutical manufacturers *never* use the same mark on these two classes of products, the fact that they are often made by the same manufacturers has a definite bearing on the likelihood that the public will think, when they do appear under the same mark, that they have the same source.

Finally, the board said that toiletries and ethical drugs are "so different in every respect" as to obviate any reasonable likelihood of confusion, mistake or deception. We have to disagree that

they are so different. In our judgment they may overlap, as in the case of a shampoo with medicinal properties, such as opposer sells.

We find ourselves in agreement with the dissenting board member who felt that the opposition should have been sustained on the basis of the use of the ankh by the Institute because, he said, "it is my opinion that persons familiar with opposer's research institute are reasonably likely to mistakenly believe that applicant's hair preparations are additional products developed by opposer through the institute."

 A further reason why we feel the opposition should clearly have been sustained is opposer's ownership of the existing registration No. 434,468 which issued in 1947. It covers products, listed above, which could obviously be over-the-counter preparations sold in drug stores[4] along with appellee's products. Since the record is devoid of any evidence that any other merchant of any product has used or is using the ankh as a trademark, we feel it most likely that its appearance on such products as are here involved would be taken as an indication of common origin.

 We will briefly comment on appellee's main arguments. It is pointed out that appellant did not originate the ankh, which comes from ancient Egypt. This fact is of no moment under the circumstances of this case. On this record, appellant was the first and only appropriator of the ankh as a trademark or service mark or business identity symbol when appellee or its predecessors in business adopted it for similar purposes.

---

3. A witness for opposer, Senior Product Manager of Winthrop Laboratories Division, explained what an ethical drug is as follows: "An ethical drug is a drug that is restricted to promotion to physicians and hospitals and can only be purchased upon the written prescription of the physician." He also said that products like Winthrop Division's "pHisoDan" shampoo are known as "ethical OTCs [over the counter]." "In other words, it can be prescribed by a physician and also can be purchased by a consumer right off the shelf * * *."

4. In using this term we intend to indicate stores that sell "drugs" in the traditional sense, such as ethical and OTC medications, toiletries and the like, and the departments of larger stores selling the same lines, as distinguished from the current so-called drug stores that sell hardware, auto supplies, beach furniture, hi-fi, food, and what have you. The existence of such emporia, however, increases likelihood of confusion, in our opinion, as does the increasing diversity of products of manufacturing corporations.

It is argued that appellant uses the ankh only as part of a composite design, some of its labels, for example, placing the ankh in an oval surrounded by the words "Sterling-Winthrop Research Institute." We think this is not sufficient to eliminate the likelihood of confusion. Indeed, it serves to associate the ankh with opposer. A point is made about the differences in the shape of the ankhs used by the parties. Since ankhs throughout centuries have often appeared in differing shapes, like the letters of the alphabet, we think the ankh is a sufficiently definite symbol as always to be recognized for what it is. It is pointed out that in spite of concurrent use by the parties over several years opposer has produced no instance of actual confusion. This familiar argument, of course, is no indication at all that no one has been confused, actual confusion is not necessary to sustain an opposition, and under the statute we have to base our decision on our best judgment as to a likelihood. Appellee says the products of the parties "are not reasonably related." We can only guess what is meant by a reasonable relationship, but, whatever it means, we think it exists because it would not be unreasonable to suppose that the same company makes both pharmaceuticals and toiletries. They are, generally speaking, all chemical compositions and are, furthermore, related in use by being applied or administered to the person. Appellee's own labels suggest "medicinal" properties for its shampoo in eliminating dandruff and, in a negative sense, in being "hypo-allergenic."

The decision of the board dismissing the opposition is reversed.

Reversed.

MILLER, Judge (concurring).

Although I agree with the result reached by the majority, I am unable to agree with some of the reasoning in its opinion.

The majority agrees with the dissenting member of the board that the opposition should have been sustained on the basis of use of the ankh by appellant-opposer's Sterling-Winthrop Research Institute. However, the opposition should be sustained on the basis of both such use *and* the four registrations for the ankh mark alone owned by appellant.

Appellee has argued that appellant only "uses" the ankh as part of the following composite mark:

The majority responds that such use "serves to associate the ankh with opposer." True enough. However, if the basis for sustaining the opposition were *only* the Institute's use of the composite mark, there would be no showing that the ankh per se is an indication of origin. See In re Mogen David Wine Corp., 372 F.2d 539, 541, 54 CCPA 1086, 1088–89 (1967).

Appellant's burden to make such a showing was satisfied by evidence of its four registrations.