THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed: 12/31/2012

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

In re Cook Medical Technologies LLC

_____

Serial No. 77882876

_____

Vincent O. Wagner of Woodard, Emhardt, Moriarty, McNett & Henry for Cook Medical Technologies LLC.

William T. Verhosek, Trademark Examining Attorney, Law Office 114 (K. Margaret Le, Managing Attorney).

_____

Before Quinn, Zervas and Lykos,
Administrative Trademark Judges.

Opinion by Quinn, Administrative Trademark Judge:

Cook Medical Technologies LLC filed, on December 1, 2009, an application to register the mark shown below



for "medical devices, namely, guiding sheaths for use in conjunction with access needles, wire guides, and dilators for providing access for diagnostic and interventional devices in vascular and non-vascular procedures" (in International Class 10). Applicant claims first use of the mark anywhere and first use in commerce on April 21, 1993. By amendment, applicant seeks a registration on the Supplemental Register. The application includes the following color statement: "The color(s) teal is/are claimed as a feature of the mark." In addition, the application includes the following description of the mark:

> The mark consists of a translucent, iridescent teal color shown along the shaft length of a rib-reinforced medical guiding sheath. The configuration of the goods shown in the drawing by broken lines are [sic] not part of the mark and are [sic] shown in the drawing solely for the purpose of showing the position of the mark on the goods.

The trademark examining attorney refused registration under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground of likelihood of confusion with three previously registered marks, all owned by the same entity.



Registration No. 2213729, issued December 29, 1998 pursuant to

Section 2(f); renewed:  for "catheters" (in International Class

10).  The registration includes the following statements:

> The drawing is lined for the color blue.
> The mark consists of the color blue as
> applied to the tip of the goods.  The dotted
> outline of the goods is intended to show the
> position of the mark and is not a part of
> the mark.



Registration No. 2213772, issued December 29, 1998 pursuant to

Section 2(f); renewed:  for "catheters" (in International Class

10).  The registration includes the following statements:

> The drawing is lined for the color blue.
> The mark consists of the color darker blue
> as applied to the tip of the goods and the
> color lighter blue as applied to the
> remainder of the indwelling length of the
> goods.  The dotted outline of the goods is
> intended to show the position of the mark
> and is not a part of the mark.



Registration No. 2875842, issued August 24, 2004 pursuant to Section 2(f); affidavit under Section 8 accepted, affidavit under Section 15 received: for "multi-lumen and single-lumen central venous catheters" (in International Class 10). The registration includes the following statements:

> The drawing is lined for the color blue.
> The mark consists of the color blue as
> applied to the tip and indwelling length of
> the goods. The dotted outline of the goods
> is intended to show the position of the mark
> and is not a part of the mark.

When the refusals were made final, applicant appealed. Applicant and the examining attorney filed briefs.

Applicant argues that its mark is distinguishable from the cited marks, none of which incorporates the color teal in any fashion, but rather identifies a different color, blue, in different specified arrangements on catheter products. Although applicant concedes that blue is a component of the color teal, it points out that blue is also a component of many other colors, including purple. Applicant contends that the examining attorney has impermissibly limited competition by equating the colors teal and blue in his likelihood of confusion analysis. According to applicant, the refusal "is built on the untenable premise that (assuming similar goods) a mark incorporating a

color that includes some degree of another color in a prior registration cannot be registered as a matter of law." (Brief, p. 6). Applicant also asserts that the examining attorney has impermissibly ignored the "translucent" and "iridescent" characteristics of its mark in the comparison with registrant's mark, as well as discounted the differences in the arrangement of the colors on the goods. In support of its arguments, applicant submitted dictionary and Wikipedia entries. Lastly, the coexistence of the marks for a period of over 18 years, applicant urges, is an indication that confusion is unlikely to occur among purchasers.

The examining attorney maintains that the colors "teal" and "blue" are "legally identical" and, in this connection, points out that the original description of applicant's mark in the application identified the claimed color as "blue/teal." As to the goods, the examining attorney asserts that they are complementary because catheters are generally used with sheaths. In support of the refusal, the examining attorney introduced dictionary definitions, and excerpts from applicant's website and third-party websites.

Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion. *In re E. I. du Pont de Nemours & Co.,* 476 F.2d 1357,

5

177 USPQ 563, 567 (CCPA 1973).  *See also, In re Majestic Distilling Company, Inc.,* 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003).  In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods and/or services.  *See Federated Foods, Inc. v. Fort Howard Paper Co.,* 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by §2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks").

The present case provides a somewhat unusual likelihood of confusion determination involving the comparison between two color marks.  Professor McCarthy has characterized these types of likelihood of confusion comparisons as "some of the most unpredictable and troublesome issues of infringement in trademark law," and noted that these kinds of issues exemplify "'shade confusion.'"  J.T. McCarthy, McCarthy on Trademarks and Unfair Competition, § 7:45.70 (4th ed. 2012).  The concern underlying arguments about "shade confusion" is that determination of the issue of likelihood of confusion between shades of color is too elusive and subjective.  Professor McCarthy offers his opinion on the topic:

> The legal scope of a trademark in color is
> not defined in scientifically objective
> terms, like the claims of a utility patent.

6

The test of infringement is not how many Pantone shades the defendant is distant from the senior user's mark, but whether the reasonably prudent customer would be likely to be confused as to source, sponsorship, affiliation or approval. Some courts blithely assume that because there are hundreds of scientifically identifiable shades, consumers can distinguish between them to identify hundreds of different commercial sources by fine variations in shade and that therefore colors will never be "depleted" and no one will be confused. In the author's opinion, this is an unrealistic view which erroneously assumes that the first competitor in a market to establish a primary color such as "red" as its distinguishing color will stand by and not sue (and likely win) when a competitor enters with a different shade of red, the junior user arguing in defense that its "yellowish red" is not confusingly similar to the senior user's "bluish red." Anyone who has gone shopping in a paint store and been unable to distinguish between fine variations of shades will appreciate the attitude of a judge or juror asked to find that "yellowish red" does not infringe "bluish red." If the decision maker thinks that the ordinary purchaser or user will see the color as a source indicator, and see them as close enough as to be likely to confuse source or affiliation, then infringement will be found, even though the color shades are not identical.

McCarthy on Trademarks and Unfair Competition, supra at

§ 7:45.70.

In the seminal case on color trademarks, *Qualitex Co. v. Jacobson Products Co.*, Inc., 514 U.S. 159, 34 USPQ2d 1161 (1995) ("*Qualitex*"), the Supreme Court rejected the shade confusion argument as a reason for the traditional ban on a single product

color as a trademark. The Court indicated that the practical problem of deciding an issue of shade confusion is no more difficult than determining whether differences in word marks would be likely to cause confusion. *Id.* at 1164-65 ("We do not believe, however, that color, in this respect, is special."). Even prior to *Qualitex,* the Federal Circuit and the Board decided issues involving the question of shade confusion. *See, e.g., In re Amsted Industries Inc.*, 972 F.2d 1326, 24 USPQ2d 1067 (Fed. Cir. 1992) (no confusion likely between orange color of plastic sheath wrapped around wire rope and orange strand in six strand wire rope); and *Amsted Industries, Inc. v. West Coast Wire Rope and Rigging, Inc.*, 2 USPQ2d 1755 (TTAB 1987) (likely confusion was found between opposer's wire rope with two adjacent strands of yellow as compared with applicant's wire rope with adjacent strands of yellow and yellowish green).

In the present case, we are asked to compare the color "blue" with "teal," a color described as "greenish blue" or "bluish green." (*See* discussion, *infra*). We will confine our likelihood of confusion analysis to the refusal based on the mark shown in Registration No. 2875842, consisting of the color blue as applied to the tip and indwelling length of the goods, because, in view of the similarity between this mark and that of applicant, this cited registration presents the strongest case for the refusal. That is, if confusion is likely between those

8

marks, there is no need for us to consider the likelihood of confusion with the other cited marks (one of which is for the mark applied to only the tip of the catheter); while if there is no likelihood of confusion between applicant's mark and the cited mark comprising not only the color blue on the tip but also running the length of the catheter, then there would be no likelihood of confusion with the other marks. *In re Max Capital Group Ltd.*, 93 USPQ2d 1243, 1245 (TTAB 2010).

We first turn to consider the goods. It is well-settled that the goods of the parties need not be identical or competitive, or even offered through the same channels of trade, to support a holding of likelihood of confusion. It is sufficient that the respective goods of the parties are related in some manner, and/or that the conditions and activities surrounding the marketing of the goods are such that they would or could be encountered by the same persons under circumstances that could, because of the similarity of the marks, give rise to the mistaken belief that they originate from the same source. *See In re Accelerate s.a.l.*, 101 USPQ2d 2047, 2050 (TTAB 2012). The issue, of course, is not whether purchasers would confuse the goods, but rather whether there is a likelihood of confusion as to the source of the goods. *In re Binion*, 93 USPQ2d 1531, 1535 (TTAB 2009). If goods are complementary in nature, or used together, this relatedness can support a finding of likelihood

of confusion. *See, e.g., In re Martin's Famous Pastry Shoppe, Inc.*, 748 F.2d 1565, 223 USPQ 1289, 1290 (Fed. Cir. 1984).

Applicant's brief is entirely silent with respect to the similarity between its guiding sheaths and registrant's catheters. This is no surprise given applicant's earlier confirmation that its sheaths "may be used in conjunction with access needles, wire guides, and dilators to provide access for such other devices, including catheters." (Response, Feb. 25, 2011). Applicant's website indicates that its goods are used "to introduce balloon, closed or nontapered-end and other catheters. The sidearm fitting allows flushing around the catheter while it is positioned inside the sheath." The third-party websites in the record corroborate the same type of complementary use, that is, guiding sheaths used in conjunction with catheters. Accordingly, we find that applicant's guiding sheaths and registrant's catheters are closely related goods. This *du Pont* factor regarding the goods weighs in favor of a finding of likelihood of confusion. *See In re Toshiba Medical Systems Corp.*, 91 USPQ2d 1266, 1272 (TTAB 2009) (medical MRI diagnostic apparatus and medical ultrasound devices are related, in part because they have complementary purposes and may be used by the same medical personnel on the same patient to address the same medical issue).

Because there are no limitations as to channels of trade or classes of purchasers in the identifications of goods in the application and cited registration, it is presumed that applicant's and registrant's goods move in all channels of trade normal for those goods, and that they are available to all classes of purchasers for those goods. *See In re Viterra*, 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012); *Paula Payne Products Co. v. Johnson Publishing Co.*, 473 F.2d 901, 177 USPQ 76 (CCPA 1973); *Kalart Co. v. Camera-Mart, Inc.*, 258 F.2d 956, 119 USPQ 139 (CCPA 1958); and *In re Linkvest S.A.,* 24 USPQ2d 1716, 1716 (TTAB 1992). Because the goods are medical devices, the goods are presumed to be sold through medical supply distributors, and the purchasers for such goods would include physicians and purchasing agents for medical facilities such as hospitals and clinics. The overlap in trade channels and purchasers are factors that weigh in favor of finding a likelihood of confusion.

The crux of this appeal centers on the similarity of the marks. When, as in the present case, the marks at issue are non-literal design marks, the similarity of the marks must be decided primarily on the basis of visual similarity. *General Foods Corp. v. Ito Yokado Co., Ltd.*, 219 USPQ 822, 828 (TTAB 1983) (the comparison of design marks comes down to a "subjective 'eye ball' reaction"); *cf. Diamond Alkali Co. v.*

11

*Dundee Cement Co.*, 343 F.2d 781, 145 USPQ 211, 213 (CCPA 1965) ("When symbol marks...are being considered, appearance is most significant. Symbols of this kind do not sound.") (citation and internal quotation marks omitted). *See* McCarthy on Trademarks and Unfair Competition, *supra* at § 23:25 (the comparison of design marks "is really nothing more than a subjective 'eyeball' test"). In this situation, when comparing the color marks at issue, we are mindful that the test is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether the marks are sufficiently similar in terms of their appearance and overall commercial impression so that confusion as to the source of the goods offered under the respective marks is likely to result. *San Fernando Electric Mfg. Co. v. JFD Electronics Components Corp.,* 565 F.2d 683, 196 USPQ 1, 3 (CCPA 1977); *Diamond Alkali*, 145 USPQ at 213 (a side-by-side comparison is not the test, but rather whether confusion is likely when "the marks are compared by separate recall later in time and removed in place"); and *Spoons Restaurants Inc. v. Morrison Inc.,* 23 USPQ 1735, 1741 (TTAB 1991), *aff'd unpublished,* No. 92-1086 (Fed. Cir. June 5, 1992). A purchaser's (even a sophisticated one) recollection of design marks is often of a general, rather than specific, nature; thus the marks may be confusingly similar despite differences between

12

them. *See, e.g., B.V.D. Licensing Corp. v. Rodriguez*, 83 USPQ2d
1500, 1509 (TTAB 2007).

As set forth in TMEP § 807.07(a)(ii) (October 2012): "The
color location statement must include the generic name of the
color claimed. The statement may also include a reference to a
commercial color identification system. The USPTO does not
endorse or recommend any one commercial color identification
system." TMEP § 1202.05(e) reads as follows:

> The description of the mark must be clear
> and specific, use ordinary language, and
> identify the mark as consisting of the
> particular color as applied to the goods or
> services. If the color is applied only to a
> portion of the goods, the description must
> indicate the specific portion. Similarly,
> if the mark includes gradations of color,
> the description should so indicate. If the
> applicant is claiming a shade of color, the
> shade must be described in ordinary
> language, for example, "maroon,"
> "turquoise," "navy blue," "reddish orange."
> This is required even if the applicant also
> describes the color using a commercial
> coloring system.

With the above information as background, we now turn to
this first *du Pont* likelihood of confusion factor which, in the
present case, focuses on the similarity or dissimilarity of the
marks in their entireties as to appearance. *In re E. I. du Pont
de Nemours & Co.*, 177 USPQ at 567. We also note that where, as
here, the goods are closely related, the degree of similarity
necessary to find likelihood of confusion need not be as great

13

as where there is a recognizable disparity between the goods. *Century 21 Real Estate Corp. v. Century Life of America*, 970 F.2d 874, 23 USPQ2d 1698, 1700 (Fed. Cir. 1992); *Jansen Enterprises Inc. v. Rind,* 85 USPQ2d 1104, 1108 (TTAB 2007); and *Schering-Plough HealthCare Products Inc. v. Ing-Jing Huang*, 84 USPQ2d 1323, 1325 (TTAB 2007). Further, in this regard, we are cognizant that likelihood of confusion takes on additional significance when the goods are pharmaceuticals or medical instruments. *See*, *e.g.*, *Glenwood Labs., Inc. v. American Home Prods. Corp.*, 455 F.2d 1384, 173 USPQ 19, 22 (CCPA 1972) ("The goods here involved being drugs, confusion as to which could unquestionably give rise to serious consequences, we think due consideration ought properly be given that fact in the determination of likelihood of confusion."); and *Ethicon, Inc. v. American Cyanamid Co.*, 192 USPQ 647, 651-52 (TTAB 1976) (applying this concept to surgical sutures and clavicle splints).[1]

Dictionary entries in the record define "teal" as "greenish blue" (merriam-webster.com); and "a bluish shade of green; shade of green tinged with blue" (wordnet.com). Wikipedia contains an entry for "teal," stating it is "a medium blue-green color," and

---

[1] *See infra*, discussion on purchaser sophistication.

"teal blue" is "a medium tone of teal with more blue."[2]

Wikipedia also contains an entry for "web colors," setting forth the available colors used in designing web pages; "teal" is described as "50% green, 50% blue." The words "translucent" and "iridescent" appear in applicant's description of its mark. "Translucent" is defined as "allowing light to pass through but diffusing it" (Wiktionary.com); and "iridescent" is defined as "varying in color when seen in different lights or from different angles." (wordmonkey.com).

Registrant's mark is described as follows: "The drawing is lined for the color blue. The mark consists of the color blue as applied to the tip and indwelling length of the goods."[3]

---

[2] In the present case we have considered the Wikipedia entries inasmuch as the examining attorney, as the nonoffering party, had an opportunity to rebut this evidence by submitting other evidence that may have called into question the accuracy of this particular Wikipedia information. *See* TBMP § 1208.03 (3d ed. rev. 2012). In any event, the other dictionary definitions essentially corroborate the Wikipedia entries. *See In re Carrier Consulting Group*, 84 USPQ2d 1028, 1032-33 (TTAB 2007).

[3] Neither applicant nor the examining attorney introduced into the record a specimen of registrant's mark to show registrant's color mark as actually used in commerce. We hasten to add that even if registrant's specimen were of record, registrant's mark covers all shades of the color "blue." In this regard, we cannot help but take note of the Board's prescience when twenty-five years ago it was faced with a likelihood of confusion analysis involving colors, *Amsted Industries Inc. v. West Coast Wire Rope & Rigging Inc.*, 2 USPQ2d at 1762 n.9:

> It may be added that, whereas we are required to determine the issue before us based on the limited descriptions and lining now provided in our rules of practice, we think that some attention should be given to whether our present practice of lining for color is adequate to contemporary needs. In *In re Owens-Corning*

Applicant's mark is described as follows: "The mark consists of a translucent, iridescent teal color shown along the shaft length of a rib-reinforced medical guiding sheath."

We find that applicant's teal color mark that runs the length of the shaft of a guiding sheath for catheters and

---

*Fiberglas Corp.*, 774 F.2d 1116, 227 USPQ 417 (Fed. Cir. 1985), *rev'g* 221 USPQ 1195 (TTAB 1984), the Court above has expressed confidence in our ability to exercise judgment in determining the registrability of trademarks based on color, taking into account the differences between color shades. *Id.*, 227 USPQ at 421. *See, generally*, E.R. Henry, "Right Hat, Wrong Peg: In re Owens-Corning Fiberglas Corporation and the Demise of the Mere Color Rule", 76 TRADEMARK REPORTER, 389 (September-October, 1986). However, this case highlights an inadequacy concerning the factual basis for such analysis, especially where an applicant introduces no evidence as to the particular shade of color which is in use. Indeed, the same inadequacy would be apparent if an opposer, owning a registration of a color mark in one of the twelve colors defined by our rules opposes registration of a color mark of an applicant based on that registration and no other evidence, also a viable option under our practice. It would seem useful in these circumstances for the Board to have before it, at least, satisfactory photographic evidence of what shade is being claimed by an applicant as well as what shade is comprised in an opposer's registration. Of course, the case before us must be determined on the basis of our present practice and rules, subject to whatever limitations they necessarily impose.

The Office subsequently changed its practice and rules. Because color marks are visual, such marks now must be depicted in color drawings, accompanied by: (1) a claim naming the color(s) that are a feature of the mark; and (2) a separate element naming the color(s) and describing where the color(s) appear and how they are used on the mark. Trademark Rules 2.37 and 2.52(b)(1). *See* TMEP § 1202.05(d) generally, §§ 807.07-807.07(g) for a discussion of color mark drawings, and §§ 808-808.03(f) for a discussion of descriptions of marks.

16

registrant's blue color mark that runs the length of a catheter are similar in appearance. Registrant's "blue" mark is not limited to a certain shade of blue and thus covers all shades of blue, including greenish blue. Thus, we find that, in the context of the goods in this case, registrant's blue and applicant's teal are similar in color. The colors run the length of the products, which are narrow in shape.[4] Indeed, as noted earlier, the original description of applicant's mark in the application identified the claimed color as "blue/teal." The fact that applicant's teal color mark may appear to be translucent and iridescent is not sufficient to distinguish the marks in a meaningful manner for purposes of our likelihood of confusion determination; in certain lighting conditions, the translucence may not be perceptible and the iridescence may result in the teal being perceived as more blue than green.[5] The similarity in appearance leads to our view that the marks engender similar overall commercial impressions when applied to closely related goods.

---

[4] The narrow shape may limit the ability to differentiate between the shades of blue.

[5] One of the arguments made in *Qualitex* against the protection of color alone as a trademark was that "lighting (morning sun, twilight mist) will affect perceptions of protected color" and, thus, "competitors and courts will suffer from 'shade confusion' as they try to decide whether use of a similar color on a similar product does, or does not, confuse customers and thereby infringe a trademark." *Qualitex*, 34 USPQ2d at 1164. The Court responded: "We do not see why courts could not apply [legal standards that exist to guide courts in comparing word marks] to a color, replicating, if necessary, lighting conditions under which a colored product is normally sold." *Id.*

The similarity between the marks weighs in favor of finding a likelihood of confusion.

As noted earlier, purchasers of applicant's goods would include medical professionals.  Applicant did not even argue, let alone submit any supporting evidence, that relevant purchasers are knowledgeable and discriminating in making purchasing decisions about medical supplies such as those sold under the involved marks.  *Cf. Edwards Lifesciences Corp. v. VigiLanz Corp.*, 94 USPQ2d 1399, 1413 (TTAB 2010).  Given the nature of the goods, however, it is reasonable for us to assume that the relevant purchasers are likely to exercise some degree of care when it comes to buying and using guiding sheaths and catheters that would be used in performing medical procedures.  It is settled, however, that even sophisticated purchasers are not immune from source confusion, especially in cases such as the instant one involving similar marks and closely related goods.  *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1846 (Fed. Cir. 2000).  *See In re Research Trading Corp.*, 793 F.2d 1276, 230 USPQ 49, 50 (Fed. Cir. 1986), citing *Carlisle Chemical Works, Inc. v. Hardman & Holden Ltd.*, 434 F.2d 1403, 168 USPQ 110, 112 (CCPA 1970) ("Human memories even of discriminating purchasers...are not infallible.").  *See also Kos Pharmaceuticals Inc. v. Andrx Corp.*, 369 F.3d 700, 70 USPQ2d 1874, 1887-88 (3d Cir. 2004) ("These trained professionals

[doctors, nurses and pharmacists] may be expected to be knowledgeable about, and to exercise care in distinguishing between, medicines. We have emphasized a countervailing concern that weighs against allowing the expertise of physicians and pharmacists to trump other factors in assessing the likelihood of confusion in drug cases....[P]hysicians are not immune from confusion or mistake....There is no reason to believe that medical expertise as to products will obviate confusion as to source or affiliation or other factors affecting goodwill." (citations omitted)). We find that the similarities between the marks and the goods sold thereunder outweigh any sophisticated purchasing decision, especially in the absence of evidence relating to the degree of care in making the decision. *See HRL Associates, Inc. v. Weiss Associates, Inc.*, 12 USPQ2d 1819 (TTAB 1989), *aff'd*, *Weiss Associates, Inc. v. HRL Associates, Inc.*, 902 F.2d 1546, 14 USPQ2d 1840 (Fed. Cir. 1990) (similarities of goods and marks outweigh sophisticated purchasers, careful purchasing decision, and expensive goods). Thus, this factor is given less weight in view of the similarities between the marks and the goods.

The sixth *du Pont* factor focuses on the number and nature of similar marks in use on similar goods. Although hardly the most probative factor in this case, the absence in the record before us of any third-party use or registration of a color mark

19

in the medical devices field tends to show that registrant's mark is unique or at least not coexisting with similar marks in the field.  Thus, there is no evidence to indicate that medical professionals who are likely to purchase the involved goods are accustomed to distinguishing between marks based on color, and particularly subtle differences in color.  *See Sterling Drug Inc. v. Sebring*, 515 F.2d 1128, 185 USPQ 649, 652 (CCPA 1975) ("Since the record is devoid of any evidence that any other merchant of any product has used or is using [opposer's design mark] as a trademark, we feel it most likely that its appearance on such products as are here involved would be taken as an indication of common origin.").

Applicant's assertion, in an ex parte proceeding, of the contemporaneous use of applicant's and registrant's marks for a period of over 18 years without actual confusion is entitled to little weight.  *See In re Majestic Distilling Co., Inc*., 65 USPQ2d at 1205 ("uncorroborated statements of no known instances of actual confusion are of little evidentiary value").  *See also In re Bisset-Berman Corp.*, 476 F.2d 640, 177 USPQ 528, 529 (CCPA 1973) (stating that self-serving testimony of applicant's corporate president's unawareness of instances of actual confusion was not conclusive that actual confusion did not exist or that there was no likelihood of confusion).  *In re Binion*, 93 USPQ2d at 1536; *In re 1st USA Realty Professionals Inc.*, 84

USPQ2d 1581, 1588 (TTAB 2007); and *In re Kangaroos U.S.A.*, 223 USPQ 1025, 1026-27 (TTAB 1984). In any event, the record is devoid of probative evidence relating to the extent of use of applicant's and registrant's marks and, thus, whether there have been meaningful opportunities for instances of actual confusion to have occurred in the marketplace. *See Cunningham v. Laser Golf Corp.*, 55 USPQ2d at 1847; and *In re Wilson*, 57 USPQ2d 1863, 1869 (TTAB 2001) ("[I]nasmuch as we have heard from neither registrant nor the Highland Orange Association in this appeal, we cannot conclude that, in fact, no instances of actual confusion ever occurred."). Accordingly, the *du Pont* factor of the length of time during and conditions under which there has been contemporaneous use without evidence of actual confusion is considered neutral.

We conclude that the factors involving the similarity between the marks and the goods, and the overlap in trade channels and purchasers weigh in favor of affirmance of the examining attorney's refusal. The sophistication of purchasers weighs, at best, slightly in favor of applicant. The absence of actual confusion factor is neutral. On balance, we conclude that the factors weigh in favor of finding a likelihood of confusion.

To the extent that any of applicant's points raises a doubt about likelihood of confusion, that doubt is required to be

21

resolved in favor of the prior registrant. *In re Hyper Shoppes (Ohio), Inc.*, 837 F.2d 840, 6 USPQ2d 1025 (Fed. Cir. 1988); and *In re Martin's Famous Pastry Shoppe, Inc.*, 223 USPQ at 1290.

In reaching our decision in this appeal, we are constrained, of course, by the inherent limitations of the nature of our administrative proceedings. *See* TBMP § 102. We do not mean to suggest by our decision herein that merely because a party obtains a registration for a single color that such registration will block others from using or registering marks for other colors, even similar colors. But in the present case, the mark is described only as the color "blue" (applied to a certain part of the goods), and therefore we have considered the mark to be for any shade that would fall under the general term "blue." That is, we decide this ex parte appeal based on the information on the face of the cited registration; we do not read in limitations.

We point out that applicant was not without possible remedies here, including seeking a consent from the owner of the cited registration, or seeking a restriction of the registration under Section 18 of the Trademark Act, 15 U.S.C. § 1068. Although we are sympathetic to applicant's concerns about the scope of protection being given to the cited registration, applicant did not avail itself of the remedy afforded by Section 18 that gives the Board the equitable power to cancel

22

registrations in whole or in part, or to "otherwise restrict or rectify...the registration of a registered mark." *See* Trademark Rule 2.133(b). *See also* TBMP § 309.03(d) and cases cited therein. A party in applicant's position can file a petition for cancellation of the cited registration, requesting a restriction or modification of registrant's description of its mark on the basis that the description is "ambiguous or overly broad and not specific to the mark actually used" in the marketplace.[6] This Section 18 claim, if successful, would modify the description of the mark from "blue" to the specific shade of blue actually used in the marketplace. Such a claim can be used to modify overly broad identification of goods (for example, "computer programs"). *See IdeasOne Inc. v. Nationwide Better Health Inc.*, 89 USPQ2d 1952, 1954-55 (TTAB 2009), *citing In re N.A.D. Inc.*, 57 USPQ2d 1872, 1874 (TTAB 2000). However, the Board will not entertain claims to modify overbroad descriptions of marks unless the proposed modification will avoid a finding of likelihood of confusion between the parties' marks. *The Wellcome Foundation Ltd. v. Merck & Co.*, 46 USPQ2d 1478, 1479 (TTAB 1998). Thus, in the present case, applicant could have brought a cancellation proceeding seeking to limit registrant's mark to "sky blue," "navy blue" or some other shade of blue (as

---

[6] Section 18 claims may be asserted only in *inter partes* proceedings, and not during an ex parte appeal; further, the Board may not grant relief under Section 18 *sua sponte*.

23

appropriate), assuming, of course, that such restriction would result in no likelihood of confusion. *See generally* T. Lemper and L. McLeod, "Embracing Marketplace Realities: Rediscovering Section 18 of the Lanham Act on the Twentieth Anniversary of Its Revival," 99 TMR 1299 (2009).

Just as Section 18 provides an avenue of relief for a party who faces a cited registration with an overly broad and no longer acceptable identification of goods, Section 18 serves the same purpose when it comes to alleged overbroad color marks that, under the old rules involving color lining, were permitted to be registered; such registrations are no longer allowed inasmuch as a drawing in color (as shown by applicant's drawing herein) is required if an applicant is claiming color as a mark. Thus, going forward, the concerns of the Board expressed in *Amsted v. West Coast* about the then-existing limitations under the old rules largely have been addressed.

**Decision:** The refusal to register is affirmed.